Filed 12/9/13  P. v. Rodriguez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>        v.<br><br>SALVADOR PARA RODRIGUEZ,<br><br>    Defendant and Appellant. | F064483<br><br>(Super. Ct. No. 10CM0005 )<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kings County.  Steven D. Barnes, Judge.

A. M. Weisman, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Charles A. French and Clifford E. Zall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

Defendant Salvador Para Rodriquez was convicted of first degree murder (Pen. Code,[1] § 187, subd. (a); count 1) and carrying a sharp instrument while confined in a penal institution (§ 4502, subd. (a); count 2). As to count 1, the jury found true special circumstance allegations of murder perpetrated by means of discharging a firearm from a motor vehicle with the intent to inflict death (§ 190.2, subd. (a)(21)), and murder perpetrated by an active participant in a criminal street gang and carried out to further the activities of the gang (*id*., subd. (a)(22)). The jury also found true gang enhancement (§ 186.22, subd. (b)(1)) and firearm discharge enhancement (§ 12022.53, subd. (e)(1)) allegations; however, the jury found not true the allegation that defendant personally and intentionally used or discharged a firearm causing death (§ 12022.53, subd. (d)). Defendant was sentenced to life without the possibility of parole (LWOP), plus 25 years to life for the firearm discharge enhancement, and 10 years for the gang enhancement on count 1, and a consecutive three-year term on count 2. Defendant was also ordered to pay restitution and various fees, fines, and assessments.

On appeal, defendant contends the trial court prejudicially erred in admitting multiple hearsay, his trial counsel rendered ineffective assistance of counsel by failing to object to several evidentiary errors, and prosecutorial misconduct during closing argument denied him a fair trial. Defendant also raises a number of claims of sentencing error. We will order the 10-year gang enhancement on count 1 to be stricken but otherwise affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise stated.

2

## FACTS

### The shooting

Around 7:30 p.m. on December 30, 2009, someone inside a blue van shot and killed Jose Manuel Aguirre (the victim) as he was standing in front of his residence at the El Dorado Trailer Park located on Highway 41 in Kings County. At the time, the victim lived with Jennifer Barajas (the victim's fiancée), who was also the sister of prosecution witness Robert Lavery.[2]

According to Lavery and the victim's friend, Marissa Spain, there was a long history of animosity between the victim, a Norteño gang member, and defendant, a Sureño gang member. Spain and Lavery were both eyewitnesses to the shooting. According to Spain's testimony, she was standing outside with the victim and several others when she saw an old blue van begin to drive by. Referring to defendant by his gang moniker, the victim asked, "Is that Casper?" Then, as the van passed in front of them, the victim made a statement to the effect the occupants of the van were just some fieldworkers returning home from work.

Spain saw the van drive towards the back of the trailer park and then return a few minutes later, driving more slowly than before. An arm with a gun extended from the front passenger window followed by a burst of orange. The victim exclaimed, "[F]uck, fuck, … these fucking scraps[3] bucked at me." The victim ran a short distance and fell face forward on the ground.

---

**2**      Lavery, who was in custody at the time of defendant's trial, had an extensive criminal history and identified himself as an "American Front Member Skin Head." Lavery testified he was familiar with the Norteños and Sureños gangs because he was a tattoo artist, and he was exposed to the gangs in prison. In prison, Caucasian gang members such as himself teamed up with the Sureños for protection, while African-American gang members teamed up with the rival Noreteños.

**3**      Scrap is a derogatory term for a Sureño or southern gang member.

Spain, who was unable to identify any of the van's occupants, confirmed defendant was not the front seat passenger.

However, Lavery did see defendant inside the van at the time of the shooting. According to Lavery, he was driving back to the trailer park from a gas station, when he spotted the blue van outside the trailer park, stopped at a stop sign. Lavery was about 10 feet from the van, when he looked inside and saw defendant. Defendant was "sitting in the back seat but he had his head closer to the middle talking to the driver" and "was pointing towards something in the trailer park." Because of the history of conflict between defendant and the victim, Lavery "thought it was going to be another fight."

Lavery followed the blue van into the trailer park and then pulled over to the side for a moment and tried to get the victim's attention. As the van drove past the victim, Lavery started backing up into his mother's driveway and got out of his car. Lavery saw the van drive to the end of the trailer park, turn around, and begin to return, driving slowly, with its lights off.

Lavery got back into his car and started to pull forward. He saw a person in the front passenger area of the blue van; the person was rolling a ski mask down over his face. Defendant was still sitting in the same place where Lavery had seen him earlier. Although everyone in the van was now wearing ski masks, Lavery recognized defendant from his clothes, which Lavery had observed when he first saw defendant outside the trailer park.

Lavery saw a flash from a gun going off and then the van leave the trailer park. Lavery watched the victim die, telling his fiancée that he loved her. Lavery described the victim as a "good kid" and regarded him as a "little brother." According to Lavery, the victim had wanted to get out of the northern gang lifestyle and Lavery had tried to help him.

4

Around 8:00 p.m. on the night of the shooting, defendant called his best friend, Santiago Hernandez. Hernandez was a member of the East Side Dukes (or ESD), a Sureño gang. Defendant told Hernandez he needed a ride to Hanford. When Hernandez asked why, defendant said somebody had died. Hernandez told defendant he needed at least an hour before he could pick him up because he was with his little daughter. Defendant called back several times with the last call coming in around 9:45 p.m. Defendant sounded nervous and impatient. Hernandez did not pick up defendant that night because he was afraid that defendant had killed somebody.

Defendant's grandmother, Maria Parra, testified that when defendant was arrested, she did not think he was expecting it. Parra learned from defendant that somebody died at the trailer park when he called her from jail the day after his arrest.

### Defendant's police interview

Detective Charles Buhl interviewed defendant following his arrest. When asked where he had been the day of the shooting, defendant initially claimed he stayed around his house and never left town. As the interview progressed, defendant started changing his story. Defendant told Detective Buhl he had forgotten he had gone to Hanford and forgot to mention he went by Elosayo Rodriguez's house. Other names came up as the interview progressed and defendant would claim he forgot to mention them.

Detective Buhl asked defendant about his phone calls to Hernandez. Defendant mentioned Hernandez was his best friend and said he called Hernandez because he needed a ride to Hanford to go pick up a bed.

When asked if he had any beefs going on, defendant said he had some issues with the victim. Defendant basically said the reason why they were having a problem was because the victim was a northerner and defendant was a southerner. However, defendant denied being "active" during the interview.

5

A video of the interview was introduced into evidence but, because of its length, only a small portion was played to the jury. In that portion, defendant claimed that, when he got back to his grandmother's house around 10:00 p.m. on the night of the shooting, she told him somebody had died in the trailer park and that she had seen it on the news.

*Jailhouse informants*

Defendant made incriminating statements to two jail inmates with whom he was housed at different times following the shooting.

Ali Lopez, a Sureño gang member, met defendant in March 2010, when they were housed in the same pod at the Kings County jail. When Lopez initiated a conversation with defendant, defendant told Lopez his name and said he was in jail for murder. Lopez testified that defendant said "he was there when a Northerner had gotten killed and he was in an older van." Defendant also said "that dude got lit up" and had a "smirk on his face" when he said it.

When asked if he recalled what color defendant said the van was, Lopez testified, "I want to say he said white or some—white if I am not mistaken, white." As to the location of the shooting, Lopez testified, "He said it happened at trailers, I think it was El Dorado or something like that, but it happened at a trailer park."

Lopez first disclosed defendant's incriminating statements sometime around May 2010, during an interview with district attorney investigator Andrew Meyer. At the time, Lopez was out of custody, awaiting sentencing in his criminal case and expecting to receive a grant of felony probation. During the interview, Meyer did not make any promises to Lopez in exchange for disclosing information about defendant.

Lopez later failed to show for sentencing in his criminal case and was taken into custody. It was at that time that Lopez's lawyer came to him and told him the district attorney was offering a deal in exchange for Lopez testifying against defendant. The deal was probation in lieu of an eight-year prison term. Lopez acknowledged he would not

6

have testified against defendant if he had not been offered the deal. Lopez was concerned he or members of his family might someday get killed by the Sureño gang because he testified against defendant.

Jesus Velasquez was incarcerated in the Kings County jail beginning around July 21, 2011, and was housed with defendant in a pod for Sureño gang members. According to Velasquez, defendant was "a high rank soldier" among the Sureños in jail. Based on his high status in gang politics, defendant had the right to ask other Sureños for their legal paperwork and booking sheets.

When Velasquez asked defendant why he was in jail, defendant said he was there for murder. Assuming defendant had shot someone, Velasquez asked defendant why he shot his victim. In response, defendant told Velasquez, "[W]hen you have so much conflict with a certain person you have to remove them."

Velasquez first disclosed incriminating information about defendant and other Sureño gang members to a jail official as part of a gang "debrief." Velasquez explained he had made a request to be removed from the Sureño pod because he feared for his life after overhearing defendant and another high-ranking soldier talking about disciplining Velasquez for failing to help his cellmate hide a weapon. Velasquez was not offered anything during the debriefing. He explained the disclosure of information about other Sureños was a requirement to prove he was really out of the gang and was not just trying to get into protective custody in order to go after other people.

Velasquez was later offered a plea bargain to testify in defendant's trial and in three other cases. In exchange for his testimony, Velasquez faced probation instead of a potential term of life in prison. According to Velasquez, some members of his family were in a witness protection program as a result of his disclosure of information and testimony against Sureño gang members.

7

### *Incidents leading up to the shooting*

On May 17, 2009, Matthew Smith, a Lemoore police officer, was dispatched to defendant's residence right before midnight. Defendant and Hernandez were sitting in front of the residence. They both had a number of injuries. Defendant said he was assaulted outside his residence by approximately six Hispanic males and one African-American male. Defendant said two of his attackers were Norteños. Defendant identified himself as a VST Sureño.

In his police interview regarding the May 2009 attack, defendant implicated the victim and expressed the belief that the victim attacked him in retaliation for an early fight between them at the trailer park. During the interview, one of the interviewers pointed out to defendant that "those busters gonna keep messing with you guys." Defendant responded, "It's on. You know?"

According to Spain, whenever defendant and the victim were around one another, there was always "drama." They hated each other since they were kids. Spain had never known anyone who had as many problems with the victim as did defendant. It seemed personal. They were always challenging each other.

In July 2009, when Spain was sitting on her porch with Lavery, the victim and a friend of his ran into her yard. They were being chased by defendant and Hernandez, both of whom were carrying knives. The incident ended when Spain intervened, telling defendant he was disrespecting her grandmother's house and that there were little kids present.

Spain further reported that, in September or October 2009, defendant was walking with a friend, when one of them tried to punch the victim through his fiancée's car window before she drove away. On that occasion, defendant called Spain a "buster bitch." Spain explained, "A buster is what Sureños call Norteños in a disrespectful way." When the victim and his fiancée returned home later, defendant and his friend were

8

waiting there with two females. When the victim and his fiancée went to pull in, one of the females cracked their windshield with a golf club.

On another occasion, Spain pulled into a gas station with the victim. By chance, they spotted defendant on his bike. The victim and a friend got out of the car and attacked defendant. Spain could not recall how many times they punched defendant, but recalled that they bragged about giving defendant rib shots.

Lavery was also aware of the history of conflict between defendant and the victim. The victim told Lavery he and defendant fought in juvenile hall. On another occasion, defendant rushed at Lavery in the trailer park, mistaking him for the victim.

On December 18, 2009, Officer Smith took photographs of Sureño gang graffiti that had appeared around defendant's neighborhood near his house. Some of the graffiti was at a Chevron station and included: "VST," "ESD," "SUR," "X3," and "187 on all busters." The other graffiti appeared at a playground area and included: "VST," "113," "X3," and "chapa killa."

Officer Smith had not seen any VST-related graffiti since defendant's arrest. To Smith's knowledge, defendant was the only Sureño gang member in Lemoore who identified as VST. The officer infrequently ran into Sureños, explaining the town was "primarily BPN" which stands for brown pride Norteño.

On the afternoon of the December 30, 2009, shooting, Lavery spoke to his sister, the victim's fiancée. She told Lavery that earlier in the day there had been an incident in which defendant had threatened the victim at a store. Defendant walked up to the victim and said "as soon as the family is not around him then he will get at him."

*Gang evidence*

In 2004, Lemoore police officer Janet Hanes, spoke to then 13-year-old defendant, after he got into a fight with another student who looked at him the wrong way. When Hanes asked defendant if he was a Sureño, defendant answered that his family members

9

were gang members so he might as well be one too.  Defendant also told the officer that he would not wear K-Swiss shoes because K-Swiss stands for "kill a scrap when I see a scrap."

On September 6, 2005, Joe Ingorvaia came into contact with defendant when defendant was 14 years old.  At the time, Ingorvaia was working as a peace officer at El Camino High School in Oceanside.  The security supervisor brought defendant to Ingorvaia because defendant was refusing to remove his hat, which had the letters VST on it.  Defendant told Ingorvaia he was from Lemoore and that VST stood for "Vicki's town south side," a gang from that area.  Defendant said he was jumped into the gang when he was 13 years old, and that he was on gang probation.  Ingorvaia patted defendant down and found a folding knife in his pocket.  Defendant said he brought the knife to school for protection.

On September 23, 2005, Lemoore police commander Steven Rossi interviewed defendant in connection with an investigation into graffiti that had appeared at a local college.  During the interview, defendant told Rossi his moniker was Casper.  Rossi took a photograph of a tattoo of three dots on defendant's left wrist.  Defendant admitted spray-painting the letters VST at the college.

On February 15, 2006, Mark Grijalva, a juvenile correctional officer, observed an altercation between defendant and David Cooper; Cooper was classified as a northern gang member.  Defendant had asked permission to get a drink from the water fountain.  When he got to the water fountain he started punching Cooper, who was working on a task next to the water fountain.  Another officer had to use pepper spray because defendant and Cooper continued fighting after everyone was told to get down.

On March 13, 2007, there was an altercation between defendant and the victim at Lemoore High School.  Lemoore police officer Oscar Lucio responded to the fight.  When Lucio spoke with defendant, defendant said he was always getting picked on by

10

Noreteño gang members because he was the only southerner at the school. Defendant said the victim wanted to fight with him because the victim was a northerner. Officer Lucio observed defendant had three dots tattooed on his hand, and one by his eye.

Kings County Sheriff's detective Robert Balderama testified regarding a number of items which were found in defendant's house following his arrest, including, among other things, a blue baseball bat, articles of blue clothing, a photograph in which everyone was wearing blue, and various gang-style drawings and music CD's.

District attorney investigator Andrew Meyer testified as an expert in criminal street gangs. The Sureños are a criminal street gang which operates on the streets, in the prison system, and local jails; it originated with the Mexican Mafia prison gang. The Sureños' primary activities are assaults, drug sales, and murder. Sureños wear blue and identify with the number 13, while their rival, the Norteños, wear red and identify with the number 14.

In Meyer's opinion, defendant was a Sureño gang member, and was a member of the Sureño subset VST, which stands for Vickie's town. Although there were not many VST members in Kings County, Meyer knew there were over three VST members in 2009.

Meyer opined that defendant was an active gang member based in part on a video recording Meyer took in the Kings County jail. Meyer explained, "I recorded the Sureños [including defendant] coming out to their yard and programming or working out as they're supposed to, as they're ordered to be good soldiers, to be strong soldiers ready for battle." While the video was being played to the jury, Meyer described what was being depicted as follows:

> "During the recording the audio that is on the recording is their cadence that they're calling out. Some of it—most of it is in Spanish and some English. They're counting uno, dos, tres and you will hear where they're supposed to be saying four they will say Sur for south or Sureño,

11

because they will not say four because four is the number of the rivals. And it is very loud, they want everybody to hear it, they want rivals, everybody in the jail to know that they're working out. I could tell they were working out just from my office at the county complex when they're out working out in the yard, that is how loud they are. [¶] … [¶]

"There is actually the—when they come out to yard they line up in formation similar to how the military formations would be, morning workouts and boot camp for example. They line up, they start doing their work outs, there will be two leaders in the front calling the cadence, and you will hear the rest of the inmates also involved in that cadence calling, and then after that they will go up and do some pull ups, work out after their initial workout together as a group. [¶] … [¶]

"If you want to stop it right there. These are all Sureños out in that yard, there is no other gang out there. If there were any other rivals out there. If there were any other rivals out there it would be a fight, they wouldn't be working out right now. It is just Sureños working out, and right there is the defendant Casper or Salvador Rodriguez known as Casper. And right there they said Sur instead of quarto, uno, does, tres, and I zoomed in on him because I wanted to see him actually say it as well, just to show that he is still an active gang member, that his allegiances are to the Sureño gang and the Mexican Mafia."

Meyer also testified regarding a jail surveillance video depicting defendant's participation in a gang-related assault. As the video was played to the jury, Meyer again described what was being depicted in the video:

"During this video it has been played once before I believe, three Sureño gang members in the pod where the defendant is being housed, including the defendant being one of the assailants assaults a fourth Sureño gang member. That assault occurred because the—they go up to him, they ask the victim in that case for his paperwork, his charges of 261.5 PC. [¶] … [¶]

"Statutory rape. The individual who gets beat up had sex with a 17 year old, his girlfriend, but that is one of those charges that even gang members have a code of honor that they're not supposed to have even though they all violate it on the streets or a lot of them on paper in jail or in a custody situation like prison is a no no, and they assault them for it. [¶] … [¶]

12

"All right—well, that is Salvador that just walked off this way, the defendant. There is Angel Diaz right here, and he looked up to the camera there for a second as he a [*sic*] walking by. There he is looking up at it again trying to see if the camera is actually pointed at him. There he looks at it again, they are all starting to commingle because they know what— they know what they're about to do. The victim is sitting back here in the back, which I would be—which I would describe this individual is looking back, distracting the person who is about to be assaulted. [¶] … [¶]

"… And then you can see—you can kind of see that stance that Velasquez was talking about, Casper is standing in it right now here with his feet kind of shaped like that [i.e., an "S"]. He happened I go to the jail and watch that or watch the Sureños and the Norteños, we watch them both. [¶] … [¶]

"Just their mannerisms. We want to know everything about them, so periodically we will go to the jail watch what they're doing, how they're acting. So the person that is controlling the camera had a feeling that something was going to happen. So Casper goes off with the victim. [¶] … [¶]

"Paperwork in his hands, and they begin assaulting him, and this case was investigated initially by patrol, by a patrol deputy, and then it was taken over by the Kings County Gang Task Force and I requested Investigator Smyers to go investigate this case."

Through hypothetical questions, Investigator Meyer opined the shooting in this case benefitted and was committed in association with a criminal street gang. He explained gang members typically do not act alone and therefore the other individuals in the van would have been fellow gang members. The shooting would benefit the gang by eliminating a rival gang member. The status of the shooter and all those participating would also go up as a result of the shooting.

In rendering his opinion, Meyer also testified that drive-by shootings were a typical gang crime and remarked: "In and out quickly, try not to be identified. It is cowardness [*sic*] really, they call it what they want, honorable, taking out the enemy, but it is really cowardous [*sic*], drive up shooting and then leaving"

13

*Possession of a sharp instrument in jail*

On April 6, 2011, a six-inch shank was found concealed inside the seam of defendant's jail-issued coveralls.

## *DISCUSSION*

### I. *Admission of Multiple Hearsay*

Defendant contends the trial court abused its discretion in admitting Lavery's testimony that his sister, the victim's fiancée, told him defendant verbally threatened the victim the afternoon of the shooting. We conclude that any error in admitting the testimony was harmless.

The relevant testimony is as follows:

"[THE PROSECUTOR]: Q. Yeah, start from the beginning, I don't want to lead you, so just tell me.

"[LAVERY]: A. I needed some cigarettes so I left the trailer park for a couple minutes to go down to the street to believe it is a 76 Station or it is a Shell to grab a pack of cigarettes, and I wanted to come back real quick because my sister was tripping on all the stuff that was going on.

"Q. Like what?

"A. Supposedly earlier that day that they had an incident with Casper, and that he said that as soon as the family is not around him then he will get at him. [¶] … [¶]

"[DEFENSE COUNSEL]: Objection, this is calling for hearsay.

"THE COURT: Overruled.

"[THE PROSECUTOR]: Q. Go ahead and answer the question. The question was there was something happening, your sister had some drama that you needed to get back to right away, what was that drama?

"[LAVERY]: A. My sister told me that she had been at the store and that Casper had walked up on him. [¶] … [¶]

"[DEFENSE COUNSEL]: Objection, hearsay.

14

"THE COURT: Sustained.

"[THE PROSECTUOR]: Q. You knew there was some drama and you needed to get back to the house where your sister was?

"[LAVERY]: A. Yeah."

In reliance on the statutory mandate that each statement in a multiple hearsay statement meet the requirements of an exception to the hearsay rule (Evid. Code, § 1201), defendant argues that, while the first level of hearsay—his statement threatening the victim—arguably falls under an exception to the hearsay rule, the second level of hearsay—the statement by Lavery's sister recounting defendant's threat to Lavery—does not fall under any exception and therefore Lavery's testimony regarding defendant's threat was inadmissible. The People concede the trial court erred for this reason. However, the People assert any error was harmless beyond a reasonable doubt (*Lilly v. Virginia* (1999) 527 U.S. 116, 139-140) because the evidence defendant threatened the victim on the day of the shooting added little to the compelling evidence of motive and intent to harm that was properly before the jury. We agree.

Contrary to defendant's suggestion, evidence he threatened the victim the day of the shooting played a minor role in the prosecution's case. The prosecution's theory was that defendant had already formed the requisite intent to kill the victim long before the day of the shooting. The prosecutor notably made no mention of defendant's threat in argument but stressed evidence of the escalating incidents of violence between defendant and the victim leading up to the shooting and the appearance of threatening gang graffiti in defendant's neighborhood 12 days before the shooting. It was primarily these circumstances, and the circumstances surrounding the shooting itself, on which the prosecution relied to prove the murder was willful, deliberate, and premeditated.[4] The

---

[4] For example, the prosecutor argued: "This was planned out, classic case of first degree murder. A studied hatred. Preplanned, that is what this means. So that is why I was talking about considering the events that happened before and right before the shooting [i.e., defendant

15

improperly admitted testimony regarding defendant's threat to "get at" the victim was cumulative to other strong evidence of defendant's motive and intent which was properly admitted.

Defendant's specific arguments in support of his claim he was prejudiced by the admission of Lavery's testimony are unpersuasive.

First, without explaining specifically how it applies to this case, defendant quotes the following language from *People v. Ireland* (1969) 70 Cal.2d 522 (*Ireland*):

> "The error was prejudicial.  The statement in question not only reflected [the declarant victim's] state of mind at the time of utterance; it also constituted an opinion on her part as to conduct which defendant would undertake at a future time.  On the basis of this hearsay opinion the jury might reasonably have inferred that [the victim] several hours before the homicide had concluded that defendant had then formed the intention to kill her.  The next logical inference, to wit, that [the victim's] assessment of defendant's then intention was accurate and defendant had in fact formed an intention to kill several hours before the homicide … strikes directly at the heart of the defense."  (*Id.* at p. 532.)

Defendant omits the contents of the hearsay statement at issue in *Ireland*, which is substantially different than the statement at issue here.  There, the murder victim purportedly made the following statement to a friend about the defendant:  "'I know he's going to *kill* me.  I wish he would hurry up and get it over with.  He'll never let me leave.'"  (*Ireland*, *supra*, 70 Cal.2d at p. 528, italics added.)  *Ireland* is not analogous to this case and does not support defendant's claim of prejudice.

Next, defendant points out the absence of evidence directly linking him to the shooting, emphasizing the following circumstances:  surveillance video recorded at the trailer park did not reveal the identity of the shooter or many details of the shooting;

pointing from inside the van to something in the trailer park and the van turning off its lights and making a u-turn before the shooting in order to ensure its escape from the trailer park], and of course months leading up to it, and that photograph of the graffiti all helps explain this."

various witnesses testified it was very dark that night and extra lights were needed before law enforcement could conduct their investigation of the crime scene; Spain did not see defendant in the trailer park or in the van at the time of the shooting and said defendant was not the shooter; Lavery thought he saw defendant in the backseat when the van was outside the trailer park, but he did not see defendant in the van at the time of the shooting and Lavery, like Spain, indicated the front seat passenger was the shooter; and there was no physical evidence (DNA, fingerprint, etc.) linking defendant to the crime scene.

Despite the lack of physical evidence, there was powerful circumstantial evidence connecting defendant to the shooting. Contrary to defendant's assertion, Lavery *did* testify to seeing defendant inside the van after it entered the trailer park. Although the occupants were wearing ski masks when he saw the van returning from the back of the trailer park, Lavery explained he recognized defendant inside the van by the clothing he was wearing. And while defendant challenges Lavery's credibility and objectivity based on his criminal background and close personal ties to the victim, defendant's presence and involvement in the shooting was further substantiated by the jailhouse informants, Lopez and Velasquez. Their testimony regarding defendant's incriminating statements contained details consistent with the eyewitnesses' accounts of the shooting and their descriptions of the longstanding animosity between defendant and the victim.[5]

---

[5] Defendant suggests Lopez and Velasquez were not reliable witnesses because they "avoided substantial prison sentences and were released on probation in exchange for their claims that [defendant] made incriminating statements to them about this case while in jail with them." However, as reflected in our factual summary, neither witness was promised anything during the interview and gang debriefing in which they first revealed defendant's incriminating statements. We also disagree with defendant's suggestion that Lopez's testimony lacked credibility because he identified the van involved in the shooting as being white, while eyewitnesses testified that it was blue. This is a minor discrepancy when viewed in light of all the accurate details Lopez provided, including the name of the trailer park where the shooting took place. Moreover, there is no evidence Lopez and Velasquez, who were in jail with defendant at different times, ever met or communicated, which might have raised some doubt as to their credibility.

Moreover, contrary to defendant's suggestion, the absence of evidence establishing he was the shooter is not significant because, as the prosecutor emphasized in closing argument, the prosecution's theories of liability for first degree murder did not depend on defendant being the actual shooter.

Finally, defendant criticizes the prosecution for basing "a substantial amount" of its case on "evidence of uncharged, unrelated crimes, and gang evidence." According to defendant, "[t]he fact that the prosecutor felt it necessary to bombard jurors with a barrage of prejudicial information only peripherally related to this case manifested an awareness that the prosecution case against [defendant] was not airtight." We disagree. The gang evidence in this case was highly relevant and probative on a number of issues at trial and does not necessarily demonstrate any weakness in the prosecution's case.

On the contrary, the evidence against defendant was very strong. In addition to the witnesses' testimony linking defendant to the shooting discussed above, other circumstantial evidence of defendant's guilt included defendant's call to Hernandez, approximately an hour after the shooting, stating he needed a ride to another town because somebody had died, defendant's shifting account of his whereabouts on the day of the shooting during his police interview, and defendant's impeachment by his own grandmother in that she reported she learned about the shooting from defendant, while he claimed he learned about the incident from her when he got back to her house that night. On the record before us, we cannot agree with defendant's theory that he was prejudiced by the admission of evidence of his threat to the victim because the prosecution's case against him was otherwise weak.

For all the forgoing reasons, we conclude any error in admitting the multiple hearsay evidence, which played a minor role in the prosecution's case and was cumulative to other compelling evidence of defendant's motive and intent, was harmless under any standard of review.

18

## II. Ineffective Assistance of Counsel

Defendant contends he received ineffective assistance of counsel at trial because defense counsel "never objected to the introduction of several objectionable items of evidence." Specifically, he argues counsel should have objected to the following: (1) Meyer's opinions on the subjective thought processes of the participants in the gang assault depicted on the jail surveillance video recording and the video itself; (2) Meyer's opinion that the charged offense constituted cowardly conduct; (3) Spain's testimony that the victim asked if defendant was in the van ("Is that Casper?"); (4) the jail workout video; and (5) evidence of unrelated, uncharged crimes. We conclude defendant has failed to demonstrate defense counsel's performance was deficient or that he was prejudiced as a result of counsel's alleged omissions.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see generally *Strickland v. Washington* (1984) 466 U.S. 668, 687-694.) This is a "'high bar,'" and surmounting it is not easy. (*Harrington v. Richter* (2011) 562 U.S. ___ [131 S.Ct. 770, 788].)

In order to prevail on a claim of ineffective assistance of counsel on appeal, the defendant "must establish deficient performance based upon the four corners of the record" (*People v. Cunningham, supra,* 25 Cal.4th at p. 1003), which "must affirmatively

19

disclose the lack of a rational tactical purpose for the challenged act or omission. [Citations.]" (*People v. Ray* (1996) 13 Cal.4th 313, 349.) "Judicial scrutiny of counsel's performance must be highly deferential…. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland v. Washington, supra,* 466 U.S. at p. 689; accord, *People v. Hinton* (2006) 37 Cal.4th 839, 876.) In addition, the defendant must prove prejudice "as a 'demonstrable reality,' not simply speculation as to the effect of the errors or omissions of counsel. [Citation.]" (*People v. Williams* (1988) 44 Cal.3d 883, 937.)

As to the failure to object in particular, "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel." (*People v. Kelly* (1992) 1 Cal.4th 495, 540.) Only if the record affirmatively discloses that counsel had no rational tactical purpose for his act or omission will a reviewing court reverse. (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

Defendant has not made the difficult showing required to overcome the presumption favoring the reasonableness of counsel's performance. Defendant does not specifically argue or point to evidence in the record establishing that counsel could have no rational tactical purpose for failing to object to the evidence he highlights. Indeed, much of the evidence, such as the prior incidents reflecting defendant's longstanding

gang membership,[6] appears to have been relevant and admissible and therefore defense counsel could have reasonably concluded any objection would be futile. Counsel is not required to make futile or unmeritorious arguments on behalf of a defendant. (*People v. McPeters* (1992) 2 Cal.4th 1148, 1173.)

However, even assuming that defense counsel's performance was deficient, defendant has failed to establish prejudice. He does not specifically address the potential impact of each of defense counsel's alleged omissions on the outcome of the trial. Instead, he simply repeats the same critique of the prosecution's case he made in arguing he was prejudiced by the erroneous admission of multiple hearsay addressed, *ante*, in part I. of our discussion. For the same reasons discussed above, we find defendant's critique of the prosecution's evidence unpersuasive and reject his suggestion that the introduction of the complained-of evidence was necessarily prejudicial because the prosecution's case against him was weak. Defendant has not proved as a *demonstrative reality* that the outcome of the trial would have been different had counsel successfully objected to any or all of the items of evidence listed above. He therefore has failed to meet his burden of proving ineffective assistance of counsel.

Moreover, our own assessment of the potential impact of each of the complained-of items of evidence convinces us that it is not reasonably probable their exclusion would have made a difference in the outcome of the trial. After carefully reviewing the jail assault and workout videos and Meyer's testimony narrating what was depicted therein, we agree with the People that they constituted "a small part of an extensive case that clearly showed that [defendant] was a long time and committed Sureño gang member who had a gang based and personal conflict with the victim in this case" and that

---

**6** Among other things, the prosecution was required to prove that defendant was an active member a criminal street gang (§ 190.2, subd. (a)(22)), something he denied in his police interview regarding the shooting.

21

defendant's "motive to commit the murder was well documented by overwhelming evidence independent of the video and any comments related to the video." Similarly, there was powerful evidence placing defendant in the van at the time of the shooting independent of Spain's hearsay testimony that upon first seeing the van, the victim asked, "Is that Casper?" We also agree with the People that neither Meyer's brief testimony, expressing the opinion that drive-by shootings were cowardly, nor evidence of defendant's uncharged crimes was unduly prejudicial such that a successful objection to the evidence likely would have changed the outcome of the trial. Furthermore, in light of the compelling evidence of defendant's guilt already discussed, we reject his claim the cumulative effect of defense counsel's alleged omissions was prejudicial.

### III.    *Prosecutorial Misconduct*

Defendant contends the prosecutor committed prejudicial misconduct during closing argument. We disagree.

"A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety. [Citation.]" (*People v. Thornton* (2007) 41 Cal. 4th 391, 454 (*Thornton*).) Defendant did not object to the alleged instances of misconduct he now claims on appeal and has therefore forfeited his claims of misconduct relating to the prosecutor's statements during closing argument.

In any event, we see no prosecutorial misconduct in closing argument. "At that stage, prosecutors have wide latitude to discuss and draw inferences from the evidence presented at trial. '"Whether the inferences the prosecutor draws are reasonable is for the jury to decide."' [Citation.]" (*Thornton*, *supra*, 41 Cal. 4th at p. 454.) As shall be seen, the complained-of remarks by the prosecutor were properly based on reasonable inferences drawn from the evidence.

22

## a. *Argument about graffiti*

Defendant first contends the prosecutor improperly argued that graffiti by an unknown person proved that defendant premeditated the charged homicide.

In support of his contention, defendant refers to the following remarks in the prosecutor's closing argument:

> "… 12 days before the murder, 12 days, you know, this Exhibit 145 tells you what is going on, and I think you can come to a conclusion that people who did this is none other than the defendant and [Hernandez], and I will tell you why. We already know what VST stands for, we know that is his subset. We also know from Officer Smith that since this defendant was incarcerated for what happened in December 30th, 2009, he has not again seen VST graffiti. We also know what this means, ESD, East Side Duke. Who else is East Side Duke, and who is VST? The only VST member in this neighborhood, in fact in the City of Lemoore as far as patrol Officer Smith says, the only one was this defendant. [Hernandez] is East Side Duke. So 12 days before the murder you see that, and of course you know what it says, 187 on all busters. That was a message, this was coming, this was premeditated. This was deliberate.…
>
> "But this is not the only one. About five, eight houses down from where he lives, 'chapa killa.' And so we know that this is a VST graffiti, because it is on the wall, you see this is not the close-up, but the longer view. This is VST, there is chapa killa, 113 percent. He was announcing that he was going to do this, that it was on …"

Defendant also refers to the following argument in the prosecutor's rebuttal:

> "It wasn't that he was just in that van. He was in the van and he was there for a reason. This was premeditated, and it was announced in those photographs when he was doing that graffiti, 187 on all busters 12 days before. [¶] I ask that you find him guilty, and that you find him guilty of first degree murder with special circumstances, thank you."

Based on the foregoing remarks, defendant complains: "The fact that appellant was a Sureño did not establish that appellant was automatically responsible for thoughts expressed in all Sureño graffiti any more than a resident of his town would be responsible for all thoughts expressed in the locality's newspaper editorials." Defendant's analogy is

23

unpersuasive because, as the prosecutor noted, there was evidence that defendant was the *only* VST gang member who lived in the area where the graffiti was found 12 days before the victim was killed, and VST-related graffiti ceased following defendant's arrest. The graffiti specifically referred to VST and the killing of members of the Noreteño gang (e.g., "187 on all busters"), the gang to which the victim belonged. It was not unreasonable or improper for the prosecutor to infer from these circumstances that defendant was responsible for creating the graffiti or that the graffiti was evidence the subsequent killing of the victim was deliberate and premeditated.

### b. *Argument about defendant pointing*

Next defendant contends the prosecutor committed misconduct by arguing that defendant was pointing at the victim when Lavery saw defendant pointing at something before the van entered the trailer park. According to defendant, the prosecutor's argument misstated Lavery's testimony and was therefore improperly based on facts not in evidence.

In closing argument, the prosecutor argued in relevant part as follows:

"It is up to you to determine whether he had enough time to deliberate, but you remember Lavery talking about seeing him in the van, seeing that van stop and then point, what was he pointing at? [Spain] talked about how she was with a group of people, a group of teenagers, and [the victim] joined them. He was pointing at [the victim]. The evidence indicates that he was saying there he is. They went there with a plan. What did they do? The van didn't—the shot didn't come on the first go round, they made a u-turn to make sure that they got away. The lights went off, do you remember, the lights were turned off, the window is rolled down and then the shooting happened. This was planned out, classic case of first degree murder.…"

In rebuttal, the prosecutor argued:

"Lavery said he pointed at something, he didn't say what he was pointing at because he couldn't see the group at that point, but when the van stopped in front of him this defendant was pointing at something. And the context you understand what was happening, it isn't just a mere fact of he was in the van .…"

24

The prosecutor did not misstate Lavery's testimony. Defendant is correct that when Lavery testified that he saw defendant pointing at "something" inside the trailer park, Lavery did not identify at what or whom defendant was pointing. However, the prosecutor never represented to the jury that it was Lavery's testimony that he saw defendant pointing at the victim. Rather, the clear thrust of the prosecutor's argument was that the circumstances surrounding the shooting supported the conclusion that defendant was pointing at the victim. This was a reasonable inference based on the evidence cited by the prosecutor.

### c. *Argument about defendant's gang culture*

Finally, defendant claims the prosecutor misstated the law by arguing "that being a gang member meant that [defendant] was automatically a member of a criminal conspiracy at the time of the shooting." The prosecutor made no such argument and we therefore reject defendant's claim.

Specifically, the prosecutor argued:

"When Lavery tells you that he saw him in the van, there was only one reason for him [defendant] to be there. Whether or not he pulled the trigger, he was in on it. He wasn't there to stop it, he wasn't there to create peace, it was consistent with everything he had done up to that point, because he has embraced the culture of violence. For as long as he can remember he has been associated with this gang. What did he say? My family members are, so I might as well be, too, that was when he was 13. And what is that part of that culture? You don't let your gang members down, you are expected to participate in that fight or that assault or that shooting. Drive-bys have been anonymous in gang members for a reason, they do these things together, they rolled up together, they intimidate, this is how they do what they do."

The prosecutor's comments on the culture of defendant's gang and the role it played in the shooting were properly based on the evidence before the jury. Nowhere did the prosecutor argue, in defendant's words, "that gang membership automatically made

25

appellant a lifetime member of an ongoing amorphous criminal conspiracy" and it is unlikely the jury would have construed the prosecutor's comments in this manner.

In short, defendant's complaints of prosecutorial misconduct are without merit. The prosecutor properly discussed and drew inferences from the evidence presented at trial.

## IV. *Cumulative Error*

Defendant contends that the cumulative impact of all of the above errors deprived him of a fair trial. We have either rejected defendant's claims of error and/or found that any errors, assumed or not, were not prejudicial.  Viewed cumulatively, we find that any errors do not warrant reversal of the judgment.  (*People v. Stitely* (2005) 35 Cal.4th 514, 560.)

## V. *Parole Revocation Fine*

Defendant contends the abstract of judgment erroneously includes a $10,000 parole revocation restitution fine pursuant to section 1202.45.  Defendant argues the fine is not legally authorized given his indeterminate LWOP sentence, and is also improper because such a fine was never imposed by the trial court at the sentencing hearing.  We disagree.

It is undisputed that at the sentencing hearing, in the presence of defendant, the trial court orally imposed a restitution fine pursuant to section 1202.4, subdivision (b), in the amount of $10,000.  It was therefore mandatory for the court to impose a parole revocation restitution fine in the same amount pursuant to section 1202.45.  "Under section 1202.45, a trial court has *no* choice and *must* impose a parole revocation fine equal to the restitution fine whenever the 'sentence includes a period of parole.'" (*People v. Smith* (2001) 24 Cal.4th 849, 853.)  The failure to impose the mandatory parole revocation restitution fine following imposition of a restitution fine pursuant to section

26

1202.4, subdivision (b) results in an unauthorized sentence. (*People v. Terrell* (1999) 69 Cal.App.4th 1246, 1255.)

In *People v. Brasure* (2008) 42 Cal.4th 1037 (*Brasure*), the defendant had been sentenced to death, but also received additional determinate sentences on related counts, for which a period of parole was applicable. (*Id.* at p. 1049.) Our Supreme Court held that where the defendant is sentenced to at least one determinate term for which parole is applicable, a parole revocation restitution fine is legally authorized and must be imposed, per statute, if a restitution fine is imposed by the court pursuant to section 1202.4, subdivision (b). (*Brasure*, *supra*, 42 Cal.4th at p. 1075.)

In so holding, *Brasure* distinguished *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, relied upon by defendant. The Supreme Court explained that the sentence imposed in *Oganesyan* did not include any determinate terms for which a period of parole applied, but only two indeterminate sentences, including life without the possibility of parole. As such, there was no basis for imposition of a parole revocation restitution fine given the express statutory language of section 1202.45. (*Brasure*, *supra*, 42 Cal.4th at p. 1075.)

*Brasure* also rejected the argument that the fine was improper because the defendant would not likely ever serve any period of parole. "As in *Oganesyan*, to be sure, defendant here is unlikely ever to serve any part of the parole period on his determinate sentence. Nonetheless, such a period was included in his determinate sentence by law and carried with it, also by law, a suspended parole revocation restitution fine. Defendant is in no way prejudiced by assessment of the fine, which will become payable only if he actually does begin serving a period of parole and his parole is revoked." (*Brasure*, *supra*, 42 Cal.4th at p. 1075.)

Defendant's sentence here includes the indeterminate sentence on count 1 but also includes, like the defendant's sentence in *Brasure*, a determinate term for which parole is applicable. We conclude *Brasure* is controlling and the imposition of the parole

27

revocation restitution fine was proper.  (*People v. Birks* (1998) 19 Cal.4th 108, 116, fn. 6.)  Because the court's minute order from the sentencing hearing and the abstract of judgment duly reflect the imposition of the parole revocation restitution fine in the amount of $10,000, stayed, notwithstanding the fact the court did not impose the fine during the sentencing hearing, no order of modification to the judgment is required.

## VI.    *Imposition of 10-year Gang Enhancement*

Defendant contends, the People concede, and we agree that the trial court was not authorized to impose both the 10-year gang enhancement under 186.22, subdivision (b)(1) and the 25 year-to-life firearm discharge enhancement under section 12022.53, subdivision (e)(1).

Because the evidence indicated defendant was not the shooter, the firearm enhancement required a finding that the offense was committed for the benefit of a gang. Where such a firearm enhancement is imposed on a nonshooter, section 12022.53, subdivision (e)(2), provides:  "An enhancement for participation in a criminal street gang pursuant to Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1 shall not be imposed on a person in addition to an enhancement imposed pursuant to this subdivision, unless the person personally used or personally discharged a firearm in the commission of the offense."

In *People v. Brookfield* (2009) 47 Cal.4th 583, the high court held section 12022.53, subdivision (e)(2), precludes double punishment whenever the fact that a crime was committed for the benefit of a criminal street gang is used both to increase the punishment for the crime and for purposes of a firearm enhancement under section 12022.53, subdivision (e)(1).  (*Brookfield*, at p. 592.)  Where both a gang enhancement and a firearm enhancement apply, the court must impose the greater of the two.  (*Id.* at p. 596; see § 12022.53, subd. (j).)  Here, that would be the firearm enhancement.  Hence,

28

the gang enhancement imposed on count 1 must be stricken.[7]

## VII.   *Drive-by Special Circumstance*

The special circumstance established by section 190.2, subdivision (a)(21) applies where "[t]he murder was intentional and perpetrated by means of discharging a firearm from a motor vehicle, intentionally at another person or persons outside the vehicle with the intent to inflict death."  Defendant says it is unconstitutionally overbroad, because the same elements are also used to establish first degree murder on a drive-by shooting theory.[8]  Because there is no meaningful distinction between first degree murder and the special circumstance, he concludes, the special circumstance violates the due process and cruel and unusual provisions of the United States Constitution.  (See, e.g., *Gregg v. Georgia* (1976) 428 U.S. 153, 189; *United States v. Cheely* (9th Cir. 1994) 36 F.3d 1439, 1442.)

The California Supreme Court has consistently and repeatedly rejected defendant's claims.  (See, e.g., *People v. Nelson* (2011) 51 Cal.4th 198, 225 [California

---

**7**    In light of our conclusion that the gang enhancement must be stricken, we do not address defendant's argument that, because he received a life sentence, he was not subject to a 10-year enhancement under section 186.22, subdivision (b)(1), but was subject instead to a 15-year minimum parole eligibility term under section 186.22, subdivision (b)(5).

**8**    Jurors were instructed defendant was being prosecuted for first degree murder (as either a perpetrator or aider and abettor) under two theories:  premeditation and shooting a firearm from a vehicle.  With respect to the latter theory, the trial court instructed that the People had to prove three things:  "One, he [(defendant)] shot a firearm from a motor vehicle.  [¶]  Two, he intentional[ly] shot at a person who was outside the vehicle.  [¶]  And three, he intended to kill that person."

Jurors were further instructed there were two special circumstances:  murder by shooting a firearm from a motor vehicle in violation of section 190.2, subdivision (a)(21), and committing the murder while an active participant in a criminal street gang in violation of section 190.2, subdivision (a)(22).  As to the former, the trial court instructed the People must prove:  "One, the defendant or perpetrator shot a firearm from a motor vehicle killing Jose Manuel Aguirre.  [¶] Two, the defendant or perpetrator intentionally shot at a person who was outside the vehicle, and at this time the defendant intended to kill."

29

homicide law and special circumstances listed in § 190.2 adequately narrow class of murderers eligible for death penalty]; *People v. Williams* (2010) 49 Cal.4th 405, 469 [§ 190.2 is not impermissibly overbroad in violation of federal Constitution; number of special circumstances is not so high as to fail to perform constitutionally required narrowing function; special circumstances are not overinclusive, either facially or as interpreted by California Supreme Court]; *People v. Abilez* (2007) 41 Cal.4th 472, 528 [double counting charged felonies—once to elevate degree of homicide to first degree murder and again to render defendant eligible for death penalty—is permissible]; *People v. Kennedy* (2005) 36 Cal.4th 595, 640 [same], disapproved on another ground in *People v. Williams, supra,* 49 Cal.4th at p. 459; *People v. Pollock* (2004) 32 Cal.4th 1153, 1195 [statutory special circumstances adequately narrow class of persons subject to death penalty]; *People v. Catlin* (2001) 26 Cal.4th 81, 158 [8th Amend. is not offended where first degree murder liability and special circumstance findings are based on common elements]; *People v. Lewis* (2001) 25 Cal.4th 610, 676 [California's death penalty sufficiently narrows class of death-eligible defendants]; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050 [special circumstances set forth in § 190.2 are not overinclusive by number or terms and have not been construed in unduly expansive manner]; *People v. Marshall* (1990) 50 Cal.3d 907, 945-946 [triple use of same facts—to support conviction for first degree murder on theory of felony murder, finding of felony-murder special circumstance, and imposition of death penalty—does not violate federal Constitution]; see also *Lowenfield v. Phelps* (1988) 484 U.S. 231, 241-246 [rejecting challenge to death sentence on ground sole aggravating circumstance found by jury at sentencing phase was identical to element of capital crime of which defendant was convicted]; *People v. Rodriguez* (1998) 66 Cal.App.4th 157, 163-164, 172-174 [upholding constitutionality of § 190.2, subd. (a)(21) against claims it impermissibly duplicates elements that elevated

homicide to first degree murder, and that it is overbroad and permits excessive sentence for possibly unpremeditated murder].)

We are bound to follow the pronouncements of our state's high court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) Accordingly, we reject defendant's claim.

## VIII. *Gang Special Circumstance*

Defendant contends that because jurors found he was not the shooter, the gang special circumstance (§ 190.2, subd. (a)(22)) was unauthorized in this case since the statutory language indicates it only applies to perpetrators, not to aiders and abettors. Defendant recognizes that this court rejected this argument in *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1086 but asks us to reconsider our decision. We decline to do so.

## IX. *Section 654*

Defendant contends imposition of both the gang special circumstance and the firearm discharge enhancement based on his gang participation violates the prohibition in section 654 against multiple punishment based on the same underlying acts. We disagree.

Section 654, subdivision (a) provides that "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

The special circumstance established by section 190.2, subdivision (a)(22) applies where "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

31

Defendant was sentenced to an additional enhancement for firearm use according to section 12022.53, subdivision (d), which provides: "*Notwithstanding any other provision of law*, any person who, in the commission of a felony ... personally and intentionally discharges a firearm and proximately causes great bodily injury ... or death, to any person other than an accomplice, shall be punished by an additional and consecutive term of imprisonment ... for 25 years to life." (Italics added.) This enhancement usually requires a finding that the defendant personally used the firearm. (*Ibid.*) However, section 12022.53, subdivision (e)(1) extends liability "to any person who is a principal in the commission of an offense" provided that "[t]he person violated subdivision (b) of Section 186.22" and "[a]ny principal in the offense committed any act specified in subdivision (b), (c), or (d)."

"It is a well-established rule ... that the Legislature may create an express exception to section 654's general rule against double punishment by stating a specific legislative intent to impose additional punishment. [Citations.] A statute which provides that a defendant shall receive a sentence enhancement in addition to any other authorized punishment constitutes an express exception to section 654." (*People v. Ramirez* (1995) 33 Cal.App.4th 559, 572-573; accord *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1139.) The same is true when a statute mandates a punishment "'[n]otwithstanding any other provision of law,'" as section 12022.53, subdivision (d) provides. (See *People v. Benson* (1998) 18 Cal.4th 24, 32, italics omitted.) A statute need not explicitly refer to section 654 in order to create an exception to its provisions. (*Benson,* at p. 32.)

The clear and unambiguous language of section 12022.53, subdivision (d) demonstrates an intent to create an exception to section 654: a term of 25 years to life is mandated "notwithstanding any other provision of law." The plain meaning of this statute compels the conclusion that section 654 has no application to defendant's case. (See *People v. Garcia* (2002) 28 Cal.4th 1166, 1172.)

32

## X.    *LWOP Term*

Lastly, defendant contends an LWOP sentence should not be subject to enhancement or consecutive terms, and requests we modify the judgment so that his sentence is "one single, logical term of [LWOP]." Quoting a concurring opinion by Justice Chin in *People v. Cleveland* (2004) 32 Cal.4th 704, 770, he argues "'when a person has been sentenced to death or LWOP, no need exists to impose any other sentence.'" Justice Chin's comment was made in the context of addressing "the absurdity of trial and appellate courts—as well as prosecutors and defense attorneys—expending energy and resources dealing with lesser sentencing issues when the defendant has also been sentenced to death or prison for life without the possibility of parole ...." (*Id.* at p. 769.) As defendant acknowledges, Justice Chin proposed a legislative solution to this situation, noting that "[t]hese are just thoughts." (*Id.* at p. 770.) Whatever the merits of Justice Chin's concerns, the Legislature has not changed the sentencing laws to address these perceived problems. We therefore decline defendant's invitation here to strike the 25-year-to-life firearm discharge enhancement and consecutive three-year term for his conviction of possessing a sharp instrument in a penal institution in count 2.

### *DISPOSITION*

The judgment is modified to strike the 10-year gang enhancement imposed on the murder conviction in count 1.  In all other respects, the judgment is affirmed.  The trial court is directed to prepare a new abstract of judgment accordingly and forward it to the Department of Corrections and Rehabilitation.

_____
HILL, P. J.

WE CONCUR:


_____
LEVY, J.


_____
CORNELL, J.